**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

*In re* **P.M.**

**No. 20-0831** (Putnam County 19-JA-8)

**MEMORANDUM DECISION**

Petitioner Mother A.C., by counsel Shawn D. Bayliss, appeals the Circuit Court of Putnam County's September 23, 2020, order terminating her custodial rights to P.M.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel Brandolyn N. Felton-Ernest, filed a response in support of the circuit court's order. The child's guardian ad litem ("guardian"), Rosalee Juba-Plumley, filed a response on behalf of the child also in support of the circuit court's order. On appeal, petitioner argues that Putnam County, West Virginia, was not a proper venue and that the circuit court erred in accepting petitioner's stipulation at the adjudicatory hearing, denying petitioner's motion for a post-dispositional improvement period, terminating her custodial rights, and limiting her post-termination contact with the child.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In January of 2019, the DHHR filed a ten-page child abuse and neglect petition setting forth allegations of petitioner's severe mental health issues which impacted her ability to parent the children, then-sixteen-year-old N.C. and then-four-year-old P.M.[2] Specifically, the DHHR stated that on December 1, 2018, Putnam County Child Protective Services ("CPS") received a referral that N.C.'s father had filed a domestic violence protective order ("DVPO") against

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990).

[2]P.M. is the only child at issue given that N.C. reached the age of majority during the proceedings and was dismissed from the matter.

petitioner on N.C.'s behalf. The reporter claimed that petitioner had ongoing mental health issues that had progressively worsened over the course of six months. The reporter stated that petitioner claimed the devil was after her, that she informed the children that "everyone [is] out to kill them," that she accused N.C. of sexually abusing her (petitioner), and that petitioner was known to have fits of rage. The reporter lastly noted that a warrant for petitioner's arrest had been based upon her assault of a family member and that a mental hygiene petition was in progress.

The DHHR alleged that, after receiving this referral, a CPS worker spoke with several family members who confirmed petitioner's severe mental health issues. N.C.'s father informed the CPS worker that petitioner had been having delusions for six months to one year. Petitioner told N.C.'s father that P.M.'s father, R.M., had dead bodies in his vehicle, that demons "were after her," and that a baby had to be sacrificed in order for her to be saved. N.C.'s father further reported that he had observed bite marks and bruises on N.C. that were caused by petitioner and that he sought a DVPO against petitioner on the child's behalf.

N.C. reported to the CPS worker that in September of 2018, petitioner suddenly told N.C. and P.M. to pack their belongings and that they drove to Kentucky for no reason. N.C. reported that, on the trip, petitioner frequently laughed hysterically for no reason. N.C. further disclosed that petitioner often told N.C. that she would end up a stripper, accused her of being in a cult, and accused her of inappropriately touching both petitioner and P.M. N.C. informed the CPS worker that petitioner accused P.M.'s father of having dead bodies in his vehicle, claimed to see dead bodies, stated that she has to "meet God in her yard," claimed people were watching her through her television, and saw "hidden messages" in movies, books, and sermons.

Petitioner's mother informed the CPS worker that criminal charges had recently been filed against petitioner after she assaulted her on November 30, 2018. Specifically, petitioner grabbed her by the hair and "was slamming her head and . . . screaming that she hated her." Petitioner was also speaking strangely and the mother "had no idea" what petitioner was talking about. P.M. witnessed the entire altercation. Petitioner's mother stated that petitioner frequently talked about demons and about how she (petitioner's mother) and her stepfather are possessed by the devil. Petitioner's mother stated that she filed a mental hygiene petition against petitioner but nothing productive had resulted from it.

The CPS worker also spoke to petitioner, who was incarcerated. Petitioner reported that she "feels that everyone is out to get her" and that she was "not crazy." During the interview, petitioner talked in circles and provided little detail about anything relevant. Petitioner stated that she was afraid that someone would hurt her but did not know who. Petitioner also asked the CPS worker who was going to hurt her, and the worker reported that nothing petitioner said made any sense. As the CPS worker was leaving the interview, petitioner asked the CPS worker not to kill her, and the CPS worker made arrangements with the facility to "keep an eye on" petitioner. Based on the foregoing, the DHHR alleged that the children were abused and neglected.

The circuit court held a preliminary hearing in January of 2019, which was continued upon petitioner's motion. Given the allegations, the circuit court ordered that petitioner undergo a forensic psychological evaluation.

In February of 2019, petitioner underwent a forensic psychological evaluation at Hudson Forensic Psychology. Petitioner denied any mental health issues during the evaluation. Despite acknowledging that she had been admitted to Highland Hospital in October of 2018, petitioner claimed that she did not know why as she had only been experiencing crying spells and tearfulness, which she blamed on "personal problems" and her recent heart attacks. Petitioner also minimized the extent of the assault she perpetrated against her mother. The evaluator noted that petitioner did not exhibit symptoms of psychosis or delusions during the evaluation. However, "[m]ultiple collateral sources made reports regarding [petitioner's] behavior that suggest[ed] a history of psychosis." The evaluator opined that petitioner's underlying cardiac disease was not a plausible cause of her psychosis symptoms and that petitioner's failure to acknowledge her documented psychiatric issues "could represent deliberate minimization of mental health problems, impaired reality testing, or both." In any event, petitioner's claims that she was released from Highland Hospital with a "clean bill of health" caused the evaluator concern as it meant that petitioner was unlikely to adhere to mental health treatment. The evaluator stated that "[d]elusional disorders tend to respond relatively slowly to antipsychotic medication, and, given [petitioner's] belief that she has no significant mental health concerns, she is unlikely to consistently engage in intervention long enough to experience sustained relief from symptoms." Resultantly, the evaluator opined that petitioner's prognosis for attaining minimally adequate parenting was poor.

After receiving the results of the psychological evaluation, the circuit court granted petitioner a guardian ad litem. The preliminary hearing was reconvened in March of 2019, and the CPS worker testified as to his investigation and the allegations contained in the petition. Of note, the CPS worker stated that petitioner was currently residing in Kanawha County, West Virginia, but had lived in Putnam County, West Virginia, at the time of the petition's filing. Petitioner did not object to this testimony. At the conclusion of the hearing, the circuit court found that there was sufficient "evidence to show that there is probable cause to believe that [petitioner] is an abusing parent within the meaning of the laws of the State of West Virginia and that there exists imminent danger" to the children.

At the adjudicatory hearing held in May of 2019, petitioner's counsel indicated that petitioner desired to stipulate to the allegations contained in the petition. Petitioner's guardian ad litem agreed and stated, "I've been very involved with [petitioner's counsel] and [petitioner], and I believe it would be in her best interest to agree." The circuit court then asked petitioner, "you, in fact, do not contest; is that right?" Petitioner responded, "I don't guess." After questioning counsel for the DHHR and the children's guardian as to their agreement, the circuit court accepted petitioner's stipulation and adjudicated her as an abusing parent.

In August of 2019, the circuit court held a hearing on petitioner's motion for a post-adjudicatory improvement period. While the DHHR and the guardian expressed concern over petitioner's ability to comply, neither objected to the motion. The circuit court found that it was "highly skeptical" of petitioner's ability to successfully complete an improvement period but granted her motion. Later that month, petitioner filed a self-represented motion for new counsel. The circuit court granted the motion, finding a breakdown in communication between petitioner and her counsel, and appointed petitioner new counsel.

In September of 2019, petitioner requested that her visitation with P.M. be reinstated, as it had been suspended at some point during the proceedings. The circuit court held petitioner's request in abeyance pending her scheduled psychiatric assessment and further ordered the child's guardian to request a report from the child's counselor as to whether visitation would be in her best interest.

The circuit court held a review hearing in October of 2019. Petitioner's counsel moved to dismiss the petition, arguing that venue was improper because neither petitioner nor the children lived in Putnam County at the time of the petition's filing. The DHHR objected to the motion, arguing that venue in Putnam Count was proper as some of the respondents were residing there at the time of the petition's filing. The DHHR argued that P.M. resided in Putman County "at least for some time" and argued that some of the allegations of abuse and neglect occurred in Putnam County. The DHHR also argued that petitioner waived the issue of improper venue by stipulating to the allegations at adjudication. The circuit court denied the motion, finding that venue was proper, that the case was "too far down the road," and that the venue issue had been waived. Petitioner's counsel also filed a motion to stay the proceedings and a motion for an additional mental status examination. Despite the fact that petitioner had recently submitted to a second psychological evaluation on September 12, 2019, and refused or was unable to comply with the recommendations of the same, the circuit court granted the motions to provide petitioner the opportunity to seek help for her obvious mental health issues.

Petitioner submitted to a forensic psychiatric evaluation in November of 2019, which she independently obtained. The evaluator diagnosed petitioner with bipolar disorder. The evaluator noted that petitioner's thought process was tangential and that she expressed paranoid thought process. For example, petitioner indicated that she did not want to answer certain questions because "someone was listening." Petitioner then stated, "I've been protected . . . now someone else is there . . . can't do this anymore," along with other unintelligible statements such as "[t]hey told me fifteen years ago this would happen and who I'd meet." Petitioner was also tearful during the evaluation, threatened to leave on multiple occasions, and threatened to go to the police. Petitioner also refused to perform one test, accusing the evaluator of recording her and using it against her. The evaluator opined that, with inpatient psychiatric treatment consisting of medication management targeting petitioner's diagnosis of bipolar disorder and competency restoration education, petitioner's competency could be restored within the foreseeable future.

At a status hearing held in January of 2020, the circuit court noted its receipt of petitioner's psychological evaluation. Petitioner spoke to the circuit court and stated that she had done everything asked of her, denied the claims against her, and expressed her uncertainty in submitting to a treatment plan as she denied any mental health issues. After discussing the next steps in the matter, the circuit court set the matter for disposition.

In June of 2020, the circuit court held a hearing on petitioner's "Motion to Recommence Visitation and/or Transfer Custody." At the outset, the circuit court dismissed N.C. from the proceedings as she had reached the age of majority. Turning to petitioner's motion, the circuit court acknowledged petitioner's mental illness but found that petitioner had made no real progress in the matter. The circuit court found that it did not know if petitioner was unwilling or unable to participate in services but that she failed to address "the core problem of her mental health." The

circuit court did not question that petitioner cared for and loved P.M. but found that it had to consider the best interests of the child. The circuit court denied petitioner's motion to transfer custody of P.M. to petitioner and further denied in-person visitation. However, the circuit court granted petitioner monitored telephone contact with the child.

The circuit court held the dispositional hearing in August of 2020. At the conclusion of the proceedings, the circuit court terminated petitioner's custodial rights to P.M. The circuit court noted that petitioner clearly cared for P.M. and, to her credit, had begun the process of obtaining mental health treatment and addressing her mental health needs. However, based upon the record before it, the circuit court found that petitioner's recent efforts had not been consistent or sustained in such a way that the circuit court "ha[d] any confidence that [petitioner] has rectified these situations or consistently received treatment in order" to be in a position to regain custody of the child. The circuit court reiterated that petitioner, "due to her illness, is not able to consistently provide the kind of parenting that would meet the requirements of the law and these proceedings." Based upon the recommendations of the children's guardian and the DHHR, the circuit court terminated only petitioner's custodial rights so that she could seek to modify disposition in the future after having addressed her mental health issues. Petitioner appeals the September 23, 2020, dispositional order.[3]

The Court has previously established the following standard of review in cases such as this:

> "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

On appeal, petitioner first argues that venue was improper in Putnam County. Petitioner contends that at the time of the petition's filing, neither she nor the children resided in Putnam County and that the allegations of abuse and neglect did not occur in Putnam County. According to petitioner, venue was proper in Kanawha County, where she lived. Petitioner maintains that because Putnam County was not a proper venue, the "entirety of this action should be dismissed and all orders herein vacated as the Putnam County Circuit Court's venue was improper such that

---

[3]P.M.'s father successfully completed an improvement period and the petition against him was dismissed. The permanency plan for the child is to remain in her father's care.

its orders are of no effect herein." Moreover, petitioner argues that venue is jurisdictional and cannot be waived.

Petitioner likens her case to *In re D.W., G.D., and D.D.*, No. 16-0895, 2017 WL 2390349 (W. Va. Jun. 2, 2017)(memorandum decision). In that case, the DHHR filed a child abuse and neglect petition against the mother in Webster County, West Virginia. *Id.* at *1. After learning of other children in a different county, the DHHR filed an amended petition in Webster County attempting to include the other children in the proceeding. *Id.* On appeal, this Court held that the Webster County Circuit Court was an improper venue as neither those children, nor the mother lived in that county. *Id.* at *3. We noted that the legislature was the paramount authority for deciding and resolving policy issues pertaining to venue and that while the need for expediency in child abuse and neglect cases was important, a circuit court was not permitted to enlarge the statutory venue created by the legislature. *Id.* at *4. Petitioner contends that, like in *In re D.W.*, the circuit court was prohibited from assuming venue under the statute.

West Virginia Code § 49-4-601(a) provides as follows:

> If the department or a reputable person believes that a child is neglected or abused, the department or the person may present a petition setting forth the facts to the circuit court in the county in which the child resides, or if the petition is being brought by the department, in the county in which the custodial respondent or other named party abuser resides, or in which the abuse or neglect occurred, or to the judge of the court in vacation. Under no circumstance may a party file a petition in more than one county based on the same set of facts.

Here, we find no error in the circuit court's conclusion that venue was proper. The petition listed petitioner's residence as being in Putnam County, and N.C. and her father reported to the investigating CPS worker that petitioner and the children moved to Putnam County in the month or two prior to the petition's filing. Further, petitioner's mother testified at the dispositional hearing regarding the incident in which petitioner attacked her in front of P.M. and about how she filed a DVPO in response. Petitioner's mother clearly stated that the incident occurred at her home in Putnam County. While petitioner contends that she resided in Kanawha County and had a residential lease demonstrating the same, she failed to provide the lease in the appendix record and simply relies upon her own self-serving statements in support. Having reviewed the record, we find that the evidence establishes that petitioner and P.M. lived in Putnam County at the time of the petition's filing and that an incident of abuse and neglect occurred in Putnam County. Because we find that venue was proper, we need not discuss petitioner's argument regarding *In re D.W.* as it is not applicable to the case at bar.

Petitioner next argues that the circuit court erred in accepting her stipulation at the adjudicatory hearing. First, petitioner avers that the court's colloquy, recounted above, was insufficient to ascertain whether she knowingly, intelligently, and voluntarily stipulated to the allegations contained in the petition. Petitioner argues that, while the Rules of Procedure for Child Abuse and Neglect Proceedings do not require any specific manner in which a circuit court must question a parent, it must at a minimum make a determination as to whether the parent understands the content of the stipulation. Petitioner asserts that the circuit court's limited colloquy here did

not meet such a requirement, especially in light of the fact that petitioner was "an incompetent psychotic woman, incapable of assisting counsel." Second, petitioner relies upon *In re E.C.*, No. 17-1050, 2018 WL 1773425 (W. Va. Apr. 13, 2018)(memorandum decision), for the proposition that circuit courts are not permitted to accept stipulations from counsel on behalf of the respondent parent. Petitioner contends that her three-word response to the circuit court's question was insufficient to constitute a stipulation and that the circuit court erred in accepting the purported stipulation of petitioner's counsel and guardian ad litem.

As petitioner correctly notes, there is no prescribed manner in which a circuit court must question a respondent parent who intends to stipulate at adjudication. Rule 26(a) of the West Virginia Rules of Procedure for Child Abuse and Neglect Proceedings requires that any stipulated or uncontested adjudication include (1) the agreed upon facts supporting court involvement concerning the subject parent's problems, conduct, or condition, and (2) a statement of the subject parent's problems or deficiencies to be addressed at the final disposition. Before the circuit court can accept a stipulated or uncontested adjudication, Rule 26(b) requires the circuit court first determine that the subject parent understands the content and consequences of his or her stipulations and is making the stipulations voluntarily.

Here, petitioner's counsel stated that "many factors ha[d] gone in to th[e] decision" to stipulate, that he had spoken to her about the same, and that it was petitioner's desire to stipulate. Petitioner's guardian ad litem further stated that she had been "very involved" with petitioner and believed that stipulating was in petitioner's best interest. Based upon those statements by petitioner's counsel and guardian ad litem, the circuit court confirmed with petitioner that she did not contest a stipulated adjudication. Neither petitioner's counsel nor her guardian ad litem objected to the resulting adjudicatory order. "'An order to which no objection was made and which was actually approved by counsel, will not be reviewed on appeal' Syl. pt. 1, *Loar v. Massey*, W.Va., 261 S.E.2d 83 (1979)." Syl. Pt. 3, *In re: S.C.*, 168 W. Va. 366, 284 S.E.2d 867 (1981). Moreover, we find petitioner's reliance upon *In re E.C.* to be misplaced. In that case, the respondent parent was not properly served and had no notice of the proceedings. *In re E.C.*, 2018 WL 1773425 at *1. Despite this lack of notice, the circuit court accepted counsel's stipulation on the parent's behalf. *Id.* Once the respondent parent was properly noticed, the circuit court failed to question him as to his voluntary stipulation. *Id.* On appeal, this Court found that the circuit court violated Rule 26 of the West Virginia Rules of Procedure for Child Abuse and Neglect Proceedings and further found that because the respondent parent did not have notice of the proceedings, he did not acknowledge or voluntarily consent to stipulating at adjudication. *Id.* at *3. Here, petitioner had notice of the proceedings and, with the advice of both her counsel and her guardian ad litem, expressed her desire to stipulate at adjudication. As such, the rationale set forth in *In re E.C.* is distinguishable from the case at bar. Under the specific circumstances of this case and given the fact that both petitioner's counsel and her guardian ad litem recommended that she stipulate at adjudication, we find no error in the circuit court's limited questioning of petitioner regarding her stipulation or its acceptance of the same.

Petitioner next argues that the circuit court erred in terminating her custodial rights without first granting her a post-dispositional improvement period. Petitioner claims that she acknowledged "her own foibles that maligned her ability to properly parent her children" and began participating in her post-adjudicatory improvement period. Petitioner argues that she

provided the circuit court sufficient evidence to demonstrate that she was likely to participate in a post-dispositional improvement period, including exhibits establishing her ongoing treatment and counseling, her lease agreement, confirmation of her employment, a credit summary, and a judgment order dismissing the criminal matter against her related to the assault of her mother. Petitioner avers that her "ability to care for her child had not been addressed through the provision of any services," which further supported her request for a post-dispositional improvement period, and she notes that P.M. was in a family placement with P.M.'s father. Petitioner states that, given her mental illness and the COVID-19 pandemic, the circuit court could have found compelling circumstances to grant her a post-dispositional improvement period. She argues this would have been the least-restrictive alternative in the matter and, therefore, the circuit court erred in terminating her custodial rights.

In order to be granted a post-dispositional improvement period, West Virginia Code § 49-4-610(3)(B) requires that petitioner "demonstrate[ ], by clear and convincing evidence, that [she was] likely to fully participate in the improvement period." Because petitioner was previously granted an improvement period, she was also required to "demonstrate[ ] that since the initial improvement period, [she] has experienced a substantial change in circumstances [and] . . . due to that change in circumstances, [she] is likely to fully participate in the improvement period." W. Va. Code § 49-4-610(3)(D). Further, "West Virginia law allows the circuit court discretion in deciding whether to grant a parent an improvement period." *In re M.M.*, 236 W. Va. 108, 115, 778 S.E.2d 338, 345 (2015). We have also previously held that

> [i]n order to remedy the abuse and/or neglect problem, the problem must first be acknowledged. Failure to acknowledge the existence of the problem, i.e., the truth of the basic allegation pertaining to the alleged abuse and neglect or the perpetrator of said abuse and neglect, results in making the problem untreatable and in making an improvement period an exercise in futility at the child's expense.

*In re Timber M.*, 231 W. Va. 44, 55, 743 S.E.2d 352, 363 (2013) (citation omitted).

Here, the evidence below established that petitioner refused to acknowledge that she had an ongoing severe mental health problem that prevented her from properly parenting the child. Indeed, as of the dispositional hearing, petitioner claimed that she did not suffer from any mental health illnesses, but rather had issues with her heart and blood pressure. Further, despite failing to participate in any mental health treatment until just prior to the dispositional hearing, petitioner claimed that she had done everything asked of her. While the court acknowledged that petitioner had begun the process of obtaining mental health treatment, it found that petitioner's recent efforts were inconsistent and that it had no confidence that she had rectified the situation such that she could properly parent the child. Having reviewed the record, we agree with the circuit court's findings and further note that because petitioner was unwilling or unable to acknowledge her mental health issues, granting her an additional improvement period would have been futile. Moreover, petitioner fails to demonstrate on appeal that she experienced a substantial change in circumstances that would have warranted the grant of a post-dispositional improvement period. Although petitioner attended some mental health treatment during the late stages of the proceedings, she maintained that she had no mental health issues, thereby demonstrating that no substantial change had occurred. Accordingly, we find no error in the circuit court's denial of petitioner's request for a post-dispositional improvement period.

8

The evidence set forth above likewise supports the termination of petitioner's custodial rights. West Virginia Code § 49-4-604(c)(6) provides that circuit courts are to terminate parental, custodial, and guardianship rights upon finding that there is "no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future" and that termination is necessary for the child's welfare. West Virginia Code § 49-4-604(d) provides that a circuit court may find that there is no reasonable likelihood that the conditions of abuse and neglect can be substantially corrected when the abusing parent has

> not responded to or followed through with a reasonable family case plan or other rehabilitative efforts of social, medical, *mental health*, or other rehabilitative agencies designed to reduce or prevent the abuse or neglect of the child, as evidenced by the continuation or insubstantial diminution of conditions which threatened the health, welfare, or life of the child.

(Emphasis added.) The record establishes that petitioner failed to respond to or follow through with rehabilitative efforts targeting her mental health issues. During the proceedings, petitioner underwent three separate psychological evaluations in an effort to assess her mental health needs and provide her with targeted recommendations to improve her parenting abilities. However, petitioner maintained throughout the proceedings that she had no mental health issues, that she had no parenting issues to correct, and that she had done everything asked of her. Only when faced with termination did petitioner attempt to comply with mental health treatment or recommendations from the psychological evaluations. Further, the evaluating psychologist from Hudson Forensic Psychology opined that petitioner's prognosis for attaining minimally adequate parenting was poor. At the time of the dispositional hearing, the circuit court found that petitioner's inconsistent participation was insufficient to establish that she had remedied the conditions of abuse and further found that her mental illness rendered her unable or unwilling to properly parent the child at that time. While petitioner claims that she should have received a less-restrictive alternative, all of the parties commended petitioner for her recent efforts and expressed their hope that she could address her mental health issues such that she could eventually regain custody of the child. Thus, she did, in fact, receive a less-restrictive alternative as the circuit court terminated her custodial rights only. Having reviewed the record, we find no error in the circuit court's decision to terminate petitioner's custodial rights as it was the least restrictive dispositional alternative given petitioner's mental health issues and her refusal or inability to address the same.

Lastly, petitioner argues that the circuit court erred in limiting her post-termination contact with P.M. Petitioner argues that P.M. had a strong, long-standing bond with her and that petitioner's conduct "did not constitute any active abuse, but passive abuse wherein her ability to properly parent the children was compromised by her mental health issues." Petitioner argues that her lack of participation was based upon difficulties arising from the COVID-19 pandemic and her mental health issues, which should not be used as a basis for denying her in-person visitation with P.M.

This Court has previously held that

> [w]hen parental rights are terminated due to neglect or abuse, the circuit court may nevertheless in appropriate cases consider whether continued visitation

9

or other contact with the abusing parent is in the best interest of the child. Among other things, the circuit court should consider whether a close emotional bond has been established between parent and child and the child's wishes, if he or she is of appropriate maturity to make such request. The evidence must indicate that such visitation or continued contact would not be detrimental to the child's well being and would be in the child's best interest.

Syl. Pt. 5, *In re Christina L.*, 194 W. Va. 446, 460 S.E.2d 692 (1995). At the time of the dispositional hearing, petitioner had clearly failed to remedy the conditions of abuse and neglect as she failed to address her severe mental health issues. Below, the circuit court had limited petitioner's contact with the child to telephone contact due to her inability to control her behavior in front of the child. In fact, the guardian noted during one of the hearings below that the parties attempted to facilitate visitation in both a supervised and therapeutic setting but that it was not able to be maintained due to petitioner's actions. However, because the child was enjoying monitored phone contact with petitioner, the circuit court determined that continued visitation in this matter was consistent with the child's best interest and further encouraged petitioner to continue with her mental health treatment in the hopes that she could someday petition the circuit court to modify disposition. Given these circumstances, we find no error in the circuit court's decision to deny petitioner in-person post-termination visitation.

For the foregoing reasons, we find no error in the decision of the circuit court, and its September 23, 2020, order is hereby affirmed.

Affirmed.

**ISSUED**: June 22, 2021

**CONCURRED IN BY**:

Chief Justice Evan H. Jenkins
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice John A. Hutchison
Justice William R. Wooton